# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION
## CRIMINAL DOCKET NO. 3:13-CR-275-FDW-DCK

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | **MEMORANDUM AND** |
| ) | **RECOMMENDATION** |
| KENNETH FITZGERALD BROWN, ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |

**THIS MATTER IS BEFORE THE COURT** on Defendant Kenneth Fitzgerald Brown's "Motion To Suppress Evidence" (Document No. 8) and the "Government's Response To Defendant's Motion To Suppress Evidence" (Document No. 16). The pending motion has been referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b), and is ripe for disposition. Having carefully considered the motion, the record, and applicable authority, as well as the testimony and arguments presented at a hearing conducted on January 28, 2014, the undersigned will recommend that the motion be denied.

### PROCEDURAL BACKGROUND

In a bill of indictment filed October 15, 2013 (Document No. 1), Defendant Kenneth Fitzgerald Brown ("Defendant") was charged with one count of possession of a firearm by a felon in violation of Title 18, United States Code, Section 922(g). Specifically, Defendant was charged with illegally possessing a Smith & Wesson 40-caliber pistol and a 50-round box of Winchester 9mm ammunition on April 5, 2013. In a superseding bill of indictment filed December 18, 2013 (Document No. 7), a second count was added, charging illegal possession of

marijuana in violation of Title 21, United States Code, Section 844(a). On the following day, December 19, 2013, Defendant filed a Motion To Suppress (Document No. 8) alleging violations of Defendant's Constitutional rights. The government filed its response in opposition to the motion to suppress (Document No. 16) on January 3, 2014. A hearing regarding this matter was conducted before the undersigned on January 28, 2014.

The issues presented, simply stated, are: did Defendant give voluntary consent to a search of his residence; was Defendant illegally seized during his encounter with police on April 5, 2013; and was Defendant subjected to custodial interrogation without <u>Miranda</u> warnings during that same encounter. In short, the Court concludes that Defendant gave voluntary consent to search, he was not illegally seized, and no <u>Miranda</u> warnings were required because he was not in custody at the time. It is recommended that Defendant's motion be denied in all respects.

**FACTUAL SUMMARY**

At the January 28, 2014 hearing in this matter, the Court heard from two sworn witnesses – Officer B.K. Russell of the Charlotte-Mecklenburg Police Department and Defendant Kenneth Fitzgerald Brown. The versions of the events testified to by these witnesses were greatly at odds with one another, and the Court is called upon to make a credibility determination regarding these witnesses. Officer Russell proved impressive as a witness: he testified in a clear, detailed way, often without referring to any notes; his demeanor was polite and professional – both on direct and cross examination; and his testimony had a logic and ring of truth to it throughout – even on cross examination as he explained items he did not include in this written report. By comparison, respectfully, Defendant was not nearly as credible: he has a long record of convictions and arrests and a clear interest in the outcome; his version of events – particularly that he did not want to let law enforcement in the house at a certain point – seemed at odds with

2

the other known facts of the incident; and, especially on cross examination, Defendant's testimony just did not make sense. The Court credits Officer Russell's testimony.

**A.     Officer B.K. Russell**

The government's first and only witness was Officer B.K. Russell, an officer with the Charlotte-Mecklenburg Police Department for 24 years. On April 5, 2013, Russell and Officer R. M. Anderson responded to the Defendant's house at 5300 Greenlefe Road in Charlotte to do follow-up investigation on a break-in that had occurred there the previous day. Ironically, given the ultimate circumstances, Defendant was the victim of that alleged break-in. Defendant opened the door and let the officers in the residence.

Russell told Defendant that he and Officer Anderson were there to talk to Defendant about the break-in that had occurred the previous day. Upon entry, Russell saw three people – Defendant, Defendant's son, and a repairman who was working on the back door. (Russell was not aware at that time that Defendant's girlfriend, Katie Gowen, was in one of the bedrooms in the house.) While Russell was there to investigate the break-in, he immediately smelled the odor of burned marijuana in the residence, though he did not mention it to Defendant or the others at that time.

Russell talked to Defendant inside the residence for ten or fifteen minutes about the break-in, and Russell described Defendant as being very polite, though he did note that Defendant became more nervous as the encounter continued. Russell, Anderson and Defendant then went outside to look at the fence as the possible entry point to the property used by the break-in perpetrator. They continued to talk about the break-in, particularly a car that had been seen leaving the area. During this conversation outside, in a way Defendant could not see, Anderson tapped her nose to signify to Russell that she smelled the odor of marijuana also.

While still outside in the yard, Russell told Defendant that he had smelled the odor of marijuana in the house upon entering. Defendant admitted that he and his son (one of the persons in the house) had smoked a marijuana blunt. The officers re-entered the house with Defendant, who continued to be very polite, though increasingly nervous. Defendant told Russell that there was marijuana in the bedroom and that Russell could retrieve it. Before showing Russell into the bedroom, he went in first, explaining that he wanted to make sure his girlfriend, Katie Gowen, was "decent." This was the officers' first indication that there was a fourth person in the house. The officers allowed Defendant to go into the bedroom for one to two minutes, and Russell testified he did not feel threatened.

Defendant then came out and showed Russell into the room. Defendant handed to Russell a homemade marijuana pipe with residue on it and a bowl or container containing marijuana "roaches." Russell observed that Defendant seemed increasingly nervous, and Russell therefore asked if there was a gun in the house; Defendant responded that there was. Despite telling Defendant not to touch the gun, Defendant reached beneath the mattress of the bed and removed a handgun. Again, even though Russell had instructed him not to touch the gun, Defendant then removed the clip, ejected a live round from the chamber, placed that round back in the clip, and placed the gun on top of the bed.

Russell indicated that he could smell the odor of "green" marijuana, as opposed to burned marijuana, also in the bedroom. Defendant indicated there was green marijuana present, and he instructed his girlfriend, Katie Gowen, to give the jar of green marijuana to Russell. Government exhibits S1 and S2, respectively, are photographs of the marijuana pipe, the bowl of marijuana roaches, and the jar of green marijuana; and the handgun and the clip. Russell testified that up to this moment neither Defendant nor anyone else in the house had asked the officers to leave.

Russell further stated that from his perspective the investigation was ongoing and no one was under arrest at that time. Defendant, Ms. Gowen, and the officers went to the living room to discuss the matter further.

Once in the living room, Russell asked Defendant for consent to search the whole house. Defendant asked about the process, and Russell explained that Defendant could consent as he had up to that time, or if he declined, Russell would apply to a judge for a search warrant. Defendant's son, who was present in the living room, advised his father (Defendant) to require the officers to get a search warrant. Defendant opted to consent to the search, and Russell went out to his patrol car to retrieve the paperwork. Upon Russell's return, Defendant reviewed the consent to search form, which is Government's Exhibit S3, and signed and dated the form, thus giving written consent to search the residence. Russell testified that during these events, Defendant continued to be polite and humble and never asked law enforcement officers to leave.

Additional officers arrived at Defendant's home, and Defendant himself opened the door for the first of these officers and allowed him in. Russell asked Defendant about the marijuana and the gun, and Defendant stated that the marijuana belonged to him and Ms. Gowen, and that Defendant got the gun from a friend for protection. During this time, Defendant's movement was not restricted, and in fact, he got up at one point to pay the repairman for the repair of the back door damaged in the break-in. In addition to seizing the marijuana items already noted and the handgun and ammunition, officers took photographs and also seized United States currency. Both Defendant and Ms. Gowen were placed under arrest.

On cross-examination, Russell stated that he wrote the police report identified as Defendant's Exhibit 1 within a few hours of the events. Russell admitted that he had omitted some details from the report, such as walking into the back yard and the exact timing of

5

obtaining written consent. Russell denied requiring Defendant's son to stay seated and ever touching Defendant's sleeve. Russell acknowledged that he was wearing a handgun and a Taser at the time of the encounter, that he had neither an arrest warrant nor a search warrant at the scene, and that there was no recording of the conversations at the residence.

**B.      Defendant Kenneth Fitzgerald Brown**

Defendant testified that around the time of this event, he was employed in two jobs – one as a supervisor of a cleaning crew at Time Warner Cable arena. Defendant was at his job at the arena when he received a text on April 4, 2013 informing him that his house had been broken into. He returned home and spoke to law enforcement officers who had responded. It appeared nothing had been taken from the house, a fact Defendant later attributed to the presence of his pit bull dog. Law enforcement officers suggested there might be no follow up investigation since there was no apparent loss.

On April 5, 2013 – the following day – Defendant arose around 7:30 a.m. and later went to the Home Depot to obtain materials to fix the door that had been damaged in the alleged break-in. Defendant testified that when he returned, the house was occupied by his son, his girlfriend Ms. Gowen, a maintenance man present to work on the door, and himself. Defendant testified that candles were burning in the house, Defendant was assisting with the repair of the door, and two CMPD officers – Russell and Anderson – arrived. Defendant voluntarily let them in the residence.

Defendant testified that Anderson told Defendant's son to sit down in the living room while placing her hand on her firearm holster. Russell expressed surprise at all the nice things in the house that had not been taken; Defendant attributed this fact to the presence of his dog. Defendant testified that he felt the officers were looking at him for something instead of

6

investigating the break-in.  Defendant asked the officers to leave and took them out the back door, which was under repair at that time.

Defendant asserted that once in the back yard, the officers asked about marijuana in the house.  Defendant testified that he did not tell the officers he was using marijuana, and he denied the presence of marijuana in the house.  Defendant claimed that Russell attempted to grab his sleeve as he walked toward the house.  Further, Defendant stated that Russell attempted to prevent him from going in by placing his hand on the glass door.  Defendant stated Russell threatened to have a search team with dogs come out if Defendant would not allow a search of the house.

Feeling he "had no other choice," Defendant allowed the officers back in the house so that Russell could do a "walk through."  Defendant stated that Russell got into a "heated moment" with his son in the living room, at which time Anderson again placed her hand on her holster and her taser.  According to Defendant, he signed the consent to search form after the marijuana and the gun had been located.  He also stated that perhaps as many as four to five officers were present at that time.  Defendant stated that he "went from being victimized to being a victim."

Defendant did not fare well on cross-examination.  Defendant acknowledged on cross-examination his many arrests and convictions.  Defendant stated that he had finished the 11th grade and could read, that he was familiar "to an extent" with the legal system, and that he had used drugs in the past, but not on the day of this incident.  In one of his two jobs, Defendant acknowledged that he in essence supervises a cleaning crew of 20-26 people.

Regarding the principal events in question, Defendant stated that it was Gowens who told Russell where the marijuana and the gun were located, though Defendant admitted handling the

gun and removing the clip and the round from the chamber. Defendant acknowledged that it is his signature that appears on the consent to search form, but he suggested that the form did not have any writing on it when he signed it. He suggested that he did not read the document before signing, repeatedly representing that he was "discombobulated" at the time.

**STANDARD OF REVIEW**

**A.     Consent To Search**

A search conducted pursuant to valid consent is a well-recognized exception to the Fourth Amendment's general warrant requirement. Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973); Trulock v. Freeh, 275 F.3d 391, 401 (4th Cir. 2001). If challenged, the district court must determine, based upon the "totality of the circumstances," whether consent was knowing and voluntary, which the government must prove by a preponderance of the evidence. See, e.g., United States v. Mendenhall, 446 U.S. 544, 557 (1980); United States v. Buckner, 473 F.3d 551, 553-55 (4th Cir.), cert. denied, 550 U.S. 913 (2007); United States v. Boone, 245 F.3d 352, 361-63 (4th Cir.), cert. denied, 532 U.S. 1031 (2001); United States v. Brugal, 209 F.3d 353, 362 (4th Cir.) (en banc), cert. denied, 531 U.S. 961 (2000); United States v. Sullivan, 138 F.3d 126, 132 (4th Cir. 1998); United States v. Elie, 111 F.3d 1135, 1144 (4thh Cir. 1997); and United States v. Lattimore, 87 F.3d 647, 650 (4th Cir. 1996) (en banc).

In Elie, the Fourth Circuit again noted the factors to be considered in determining "whether . . . consent to search was freely and voluntarily given";

> [I]t is appropriate to consider the characteristics of the accused (such as age, maturity, education, intelligence, and experience) as well as the conditions under which the consent to search was given (such as the officer's conduct; the number of officers present; and the duration, location, and time of the encounter).

8

111 F.3d at 1144.  Accord Boone, 245 F.3d at 361-62; and Lattimore, 87 F.3d at 650.  "Written consent supports a finding that consent was voluntary."  Boone, 245 F.3d at 362 (emphasis added), citing United States v. Navarro, 90 F.3d 1245, 1257 (7th Cir. 1996).  Accord United States v. Coleman, 588 F.3d 816, 819 (4th Cir. 2009).

**B.      Seizure Of Defendant**

While the Fourth Amendment prohibits unreasonable seizures by the government, it does not prevent all contact between law enforcement and citizens.  Instead, the Amendment prohibits "arbitrary and oppressive interference by enforcement officials . . . ." INS v. Delgado, 466 U.S. 210, 215 (1984) (quoting United States v. Martinez-Fuerte, 428 U.S. 543, 554 (1976)).  A person is considered seized in violation of the Fourth Amendment "if the circumstances of the encounter are so intimidating as to demonstrate that a reasonable person would have believed he was not free to leave if he had not responded." Delgado, 466 U.S. at 215. The Fourth Circuit noted that, "[v]oluntariness is not, however, to be equated with the absolute absence of intimidation for under this test virtually no statement would be voluntary." United States v. Pelton, 835 F.2d 1067, 1072 (4th Cir. 1987) (internal quotation marks and citations omitted).

In determining whether a seizure occurred, courts consider the following factors:

> (i) the number of police officers present at the scene; (ii) whether the police officers were in uniform; (iii) whether the police officers displayed their weapons; (iv) whether they touched the defendant or made any attempt to physically block his departure or restrain his movement; (v) the use of language or tone of voice indicating that compliance with the officer's request might be compelled; (vi) whether the officers informed the defendant that they suspected him of illegal activity rather than treating the encounter as routine in nature; and (vii) whether, if the officer requested from the defendant ... some form of official identification, the officer promptly returned it.

9

United States v. Black, 707 F.3d 531, 537-38 (4th Cir. 2013) (internal quotation marks and citations omitted).

**C.    Miranda Warnings**

Miranda warnings are required when a subject is interrogated while in custody. Miranda v. Arizona, 384 U.S. 436 (1966). Accord Dickerson v. United States, 530 U.S. 428, 444 (2000) (reaffirming Miranda as "a constitutional rule that Congress may not supersede legislatively," reversing unique Fourth Circuit holding to the contrary). The test for determining whether an individual is "in custody" for Miranda purposes is whether, under the totality of the circumstances, the "suspect's freedom of action is curtailed to a degree associated with formal arrest." Berkemer v. McCarty, 468 U.S. 420, 440 (1984) (internal quotations) omitted). See, e.g., United States v. Hargrove, 625 F.3d 170, 178 (4th Cir. 2010), cert. denied, 132 S. Ct. 292 (2011); United States v. Colonna, 511 F.3d 431, 435 (4th Cir. 2007); United States v. Uzenski, 434 F.3d 690, 704-05 (4th Cir. 2006); United States v. Photogrammetric Data Services, 259 F.3d 229, 240-43 (4th Cir. 2001), cert. denied, 535 U.S. 926 (2002); and United States v. Howard, 115 F.3d 1151, 1154 (4th Cir. 1997). The key question is whether, viewed objectively, "a reasonable man in the suspect's position would have understood his position" as being "in custody." Berkemer v. McCarty, 468 U.S. at 422. Accord Stansbury v. California, 511 U.S. 318, 322, 325 (1994); and Hargrove, 625 F.3d at 178.

There are several other exceptions to the general rule requiring Miranda warnings before an individual "in custody" may be interrogated. For example, there is the limited "public safety exception" first recognized in New York v. Quarles, 467 U.S. 649 (1984), which permits pre-Miranda warning questioning at the scene of an arrest regarding weapons, drug use, or other matters relevant to the safety of the officers or members of the public.

10

## DISCUSSION

A.  **Defendant Voluntarily Submitted To a Search of His Residence**

In its motion to suppress, Defendant first argues that, under applicable law, Defendant did not voluntarily consent to a search of his residence. Specifically, Defendant argues that the government cannot bear its burden to show that under the totality of the circumstances Defendant gave a voluntary consent to the search. Among other things, Defendant argues that he told Officer Russell to leave, that Officer Russell did not inform Defendant that he could refuse the search, and that Officer Russell pressured Defendant by telling him that he would obtain a search warrant if Defendant did not consent. These things, it is argued, "nullified" the voluntariness of the consent.

The government asserts in response that "the search of Defendant's residence was lawful because Defendant consented to the search both orally and in writing." Citing the seminal Schneckloth case, the government notes that searches conducted pursuant to valid consent are constitutionally permissible and do not violate the Fourth and Fourteenth Amendments. Acknowledging the totality of the circumstances test, the government argues that the testimony of Officer Russell establishes that Defendant voluntarily consented to the search of his home − not once, but twice. As previously noted, the Court credits the impressive testimony of Officer Russell (and conversely discredits the testimony of Defendant) and concludes based thereon that Defendant voluntarily consulted to the search in question.

As stated above, the legal standard here is familiar and clear. A search conducted pursuant to valid consent is a well-recognized exception to the Fourth Amendment's general warrant requirement. Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973). If challenged, the district court must determine, based upon the "totality of the circumstances," whether consent

was knowing and voluntary, which the government must prove by a preponderance of the evidence. See, e.g., United States v. Mendendall, 446 U.S. 544, 557 (1980); United States v. Buckner, 473 F.3d 551, 553-55 (4th Cir.), cert. denied, 550 U.S. 913 (2007). In United States v. Elie, 111 F.3d 1135, 1144 (4th Cir. 1997), the Fourth Circuit directed what factors should be considered in assessing the voluntariness of the consent given:

> [I]t is appropriate to consider the characteristics of the accused (such as age, maturity, education, intelligence, and experience) as well as the conditions under which the consent to search was given (such as the officer's conduct; the number of officers present; and the duration, location, and time of the encounter).

The testimony of Officer Russell, a summary of which is set forth above, need not be repeated at length here. Officers Russell and Anderson went to Defendant's residence to investigate a breaking and entering, and Defendant willingly let them in. Defendant accompanied the officers into the yard to look at a fence. Having been told by the officers that they smelled burned marijuana in the house, Defendant willingly allowed the officers back in the house. Searching based on Defendant's oral consent, the officers subsequently discovered marijuana, a firearm, and ammunition, along with other items. Defendant later executed a written consent to search form, which was an exhibit at the hearing of this matter. Defendant testified at the hearing that the signature on this form is in fact his.

Defendant's background is also consistent with a knowing and voluntary consent to search the home. At the time of these events, Defendant was a 49-year old man who had completed the 11th grade in school. Defendant held two jobs, including one as an apparent supervisor of 20-26 cleaning personnel at Time Warner Arena. Defendant has had numerous contacts with law enforcement over the years, including 29 arrests and several felony convictions. In short, Defendant understood what was happening and "knew the drill,"

suggesting strongly that both his oral and written consents to search were knowing and voluntary.

One specific argument made by Defendant bears addressing. The government concedes that there was discussion between Defendant and Officer Russell about the search warrant process at about the same time the written consent to search form was being presented. Defendant argues that this was coercive and unlawful, "nullifying" Defendant's consent. First of all, the Court interprets Officer Russell's comments to Defendant as merely a description of the process, not coercive behavior on his part. In addition, several courts, including this Court in an unpublished decision, have held that an officer's statement that he would apply for a search warrant if consent was not given was not coercive. See United States v. Short, 387 F. App'x 308, 316 (4th Cir. 2010); United States v. Morgan, No. 3:04CR261, 2005 WL 2662761, at *6-7 (W.D.N.C. October 19, 2005) (Conrad, J.). The discussion of the warrant process is but one fact to consider in determining under the totality of the circumstances whether the consent was knowing and voluntary.

In short, then, the testimony of Officer Russell, which the Court credits, was clear and compelling. Defendant gave knowing and voluntary consent to search his home – at least once orally and an additional time in writing. Under the totality of the circumstances test, the search was a lawful consent search, and Defendant's argument to the contrary is unavailing.

**B.     Defendant Was Not Illegally Seized**

Defendant next argues that he was illegally seized during the April 5, 2013 incident and therefore any items seized or statements given by Defendant were illegally obtained. In essence, what Defendant claims is that at some point during the encounter, he was not "free to leave" and had therefore been seized. This seizure, Defendant argues further, was not based on probable

cause in that there was an insufficient basis that he illegally possessed either the marijuana or the firearm. Defendant argues that the result of the search and Defendant's inculpatory statements must therefore be suppressed pursuant to the "fruit of the poisonous tree" doctrine.

The government counters by arguing that the facts simply do not establish that a seizure occurred here. The government notes that a person is considered seized in violation of the Fourth Amendment "if the circumstances of the encounter are so intimidating as to demonstrate that a reasonable person would have believed he was not free to leave if he had not responded." INS v. Delgado, 466 US 210, 215 (1984). In determining whether a seizure has occurred, courts consider a number of factors:

> (i) the number of police officers present at the scene; (ii) whether the police officers were in uniform; (iii) whether the police officers displayed their weapons; (iv) whether they touched the defendant or made any attempt to physically block his departure or restrain his movement; (v) the use of language or tone of voice indicating that compliance with the officer's request might be compelled; (vi) whether the officers informed the defendant that they suspected him of illegal activity rather than treating the encounter as routine in nature; and (vii) whether, if the officer requested from the defendant ... some form of official identification, the officer promptly returned it.

United States v. Black, 707 F.3d 531, 537-38 (4th Cir. 2013) (internal quotation marks and citations omitted).

Again keeping in mind that the Court credits the testimony of Officer Russell, the record is replete with facts showing that Defendant was not illegally "seized" during the April 5, 2013 encounter. The government's analysis of this issue in its brief is compelling and on point:

> Applying these factors to the instant cases leads to the inescapable conclusion that Defendant was not seized. Only two officers were present in the residence when Defendant gave verbal and written consent to search the residence and when Defendant stated that the marijuana and gun were his. This number is less than the number of civilians in the residence at that time. While Officers Russell and Anderson were in uniform and arrived in a marked patrol car, they

14

never drew their weapons on Defendant or anyone else on the scene (nor does Defendant contend they did). This was in spite of the fact that Defendant handled the gun in front of Officer Russell and against Officer Russell's instructions. Defendant was not handcuffed, restrained, nor previously told he was under arrest when he gave consent to search nor when he told Officer Russell that the gun and marijuana was his. To the contrary, officers allowed Defendant to move about the house even after the evidence was found and Defendant admitted to possessing the marijuana and the gun. While officers made clear that they suspected Defendant of illegal activity, there is no evidence or accusation by Defendant that the language or tone of voice used by the officers suggested that he must comply with the officer's requests.

Defendant contends that law enforcement officers were allowed in his residence solely for the purpose of questioning Defendant about the break-in and that once they began questioning him about the marijuana odor he was illegal seized. Yet there is no evidence that Defendant placed restrictions on officers' questions when he invited them into his home. Moreover, the fact that the officers' line of questioning transitioned from the breaking and entering that occurred the night before to illegal contraband in Defendant's residence is not, without more, a Fourth Amendment violation. The Supreme Court stated in *I.N.S. v. Delgado*, "Police questioning, by itself, is unlikely to result in a Fourth Amendment violation. While most citizens will respond to a police request, the fact that people do so, and do so without being told they are free not to respond, hardly eliminates the consensual nature of the response." 466 U.S. at 216. In light of the totality of circumstances, Defendant was not improperly seized by law enforcement officers at the time he gave consent and admitted to possessing the marijuana and gun.

In short, there is simply no persuasive argument that Defendant was illegally seized during the April 5, 2013 encounter at Defendant's home. Applying the Black criteria, it is clear that Defendant was not "seized" until he was placed under arrest, which occurred after the consent searches had largely been conducted and Defendant had made inculpatory statements about the marijuana and the firearm. There was no illegal seizure of Defendant's person, eliminating any argument that evidence should be suppressed based on that premise.

**C.      Defendant Was Not In Custody And <u>Miranda</u> Warnings Were Not Required**

The final issue, ironically, is not an issue raised by Defendant in his brief, but one which was addressed in the government's brief and by the Court itself at the hearing on the motion. An argument Defendant might have made – closely associated with his illegal seizure argument – is that Defendant was subjected to custodial interrogation without <u>Miranda</u> warnings and therefore his statements should be suppressed. In other words, the question posed is whether Defendant was at some point in custody at his home on April 5, 2013 and thereafter questioned without any <u>Miranda</u> warnings being given.

The government's response is similar to its argument regarding the illegal seizure issue above. <u>Miranda</u> warnings need not be given in non-custodial situations, and the government notes that within the meaning of <u>Miranda</u>, the "question of custody typically turns on whether 'a reasonable person would have felt he or she was not at liberty to terminate the interrogation and leave.'" <u>United States v. Jamisen</u>, 509 F.3d 623, 628 (4th Cir. 2007) (quoting <u>Thompson v. Keshane</u>, 516 U.S. 99, 112 (1995)). The government cites a Fourth Circuit decision, <u>United States v. Parker</u>, 262 F.3d 415, 419 (4th Cir. 1997), where the Court found the following facts persuasive in concluding the defendant was not in custody: (1) the defendant was told she was not under arrest during the interview; (2) the defendant was not handcuffed or restrained; (3) the agents did not draw weapons in the defendant's presence; (4) the defendant was in her own home and a relative entered the room; and (5) the defendant was never told she was not free to leave.

On the facts of the case, again crediting the testimony of Officer Russell, the question of "custody" is not a close one. Again, the government's analysis from their brief is persuasive:

> All relevant factors in this case point towards the finding that Defendant was not in custody when he told Officer Russell that he possessed the marijuana and the gun. Officers never drew their weapons on Defendant or any of the other civilians in the home. Defendant made his statement to Officer Russell in the living room in

the presence of his son and his girlfriend. Additionally, Defendant was not handcuffed nor restrained when he made these statements. To the contrary, Officer Russell asked Defendant, Ms. Gowen, and Defendant's son who the marijuana and gun belonged to specifically to determine who should be arrested and taken into custody. Until that point, officers were unsure who was responsible for the illegal contraband. These facts taken in totality clearly show that Defendant was not in custody at the time he told police the marijuana and gun belonged to him.

In short, Defendant was not in custody when he made his inculpatory statements to Officer Russell in his home on April 5, 2013. He was in fact not in custody until he was actually placed under arrest, which occurred after the statements were made. Since Defendant was not in custody at the time of the questioning that elicited the incriminating responses, Miranda warnings were not yet required, and any motion to suppress on this basis should be denied.

## CONCLUSION

The matter before the Court is Defendant's motion to suppress evidence and statements gathered at Defendant's home on April 5, 2013. As set forth above, the Court concludes that Defendant gave knowing and voluntary consent to search his home – both orally and in writing; Defendant was not illegally seized at his home during the April 5, 2013 search; and Miranda warnings were not required during the April 5, 2013 encounter because, up to the time of his actual arrest, Defendant was not in custody. The motion should be denied.

## RECOMMENDATION

**FOR THE FOREGOING REASONS**, the undersigned respectfully recommends that Defendant Kenneth Fitzgerald Brown's "Motion To Suppress Evidence" (Document No. 8) be **DENIED**.

## TIME FOR OBJECTIONS

The parties are hereby advised that pursuant to 28 U.S.C. § 636(b)(1)(C), and Rule 72 of the Federal Rules of Civil Procedure, written objections to the proposed findings of fact,

conclusions of law, and recommendation contained herein may be filed within **fourteen (14) days** of service of same. Responses to objections may be filed within fourteen (14) days after service of the objections. Fed.R.Civ.P. 72(b)(2). Failure to file objections to this Memorandum and Recommendation with the District Court constitutes a waiver of the right to *de novo* review by the District Court. <u>Diamond v. Colonial Life</u>, 416 F.3d 310, 315-16 (4th Cir. 2005). Moreover, failure to file timely objections will preclude the parties from raising such objections on appeal. <u>Diamond</u>, 416 F.3d at 316; <u>Page v. Lee</u>, 337 F.3d 411, 416 n.3 (4th Cir. 2003); <u>Snyder v. Ridenhour</u>, 889 F.2d 1363, 1365 (4th Cir. 1989); <u>Thomas v. Arn</u>, 474 U.S. 140, 147-48 (1985), <u>reh'g denied</u>, 474 U.S. 1111 (1986).

Signed: April 2, 2014

David C. Keesler
United States Magistrate Judge